UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GUERRIER HENRI,

              Plaintiff,

      -against-

THÉRIEL THÉLUS and SENET D. ACHILL,

            Defendants.

Case No.: 24-cv-00329

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

DANIEL SZALKIEWICZ &
ASSOCIATES, P.C.

Daniel S. Szalkiewicz, Esq.
Cali P. Madia, Esq.
23 West 73rd Street, Suite 102
New York, NY 10023
(212) 706-1007
daniel@lawdss.com
*Attorneys for Defendants*

**Table of Contents**

PRELIMINARY STATEMENT ...................................................... 5

STATEMENT OF FACTS AS ALLEGED IN THE COMPLAINT ............................................ 5

ARGUMENT ...................................................................... 8

I.    The Tweets, Radio Broadcasts, and Stories upon which Defendants' Statements were Based should be Considered by the Court. ............................................... 9

    A.    Consideration of the Underlying Reporting is Appropriate as it is Incorporated by Reference and/or Because it is Integral to the Complaint and Plaintiff had Actual Notice...... 10

    B.    Consideration of the Second Letter is Appropriate as it is Integral to the Complaint ...... 13

    C.    Radio Interviews between Plaintiff and Criminals .......................................... 13

II.    The Statements are Protected by the Fair Report and Fair Index Privilege. .................... 14

    A.    The Headline Is a Fair Index of the Article's Truthful Contents ..................................... 15

    B. The Headline and Article a Privileged Fair Report of Governmental Proceedings ............. 17

III.    Defendants are Protected by the Republication Exception or Wire Service Defense ...... 19

IV.    The Article is Nonactionable because Plaintiff is a Public Figure and the Complaint Fails to Adequately Allege Malice. ..................................................................... 20

    A.    Plaintiff is a Public Figure. ..................................................... 21

    B.    Plaintiff has not Plausibly Alleged Malice. ..................................... 23

V.    The Statements are True ......................................................... 24

CONCLUSION..................................................................... 25

## Table of Authorities

**Cases**

Biro v. Condé Nast, 807 F.3d 541, 544, aff'd 622 F. App'x 67 (2d Cir. 2015) .................... 21, 22

Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30 (1984) .......................... 21

Cholowsky v. Civiletti, 887 N.Y.S.2d 592, 595–96 (2d Dep't 2009) .......................................... 17

Coleman v Grand, 523 F Supp 3d 244, 255 (EDNY 2021) .......................................................... 21

Curtis Publ'g Co. v. Butts, 388 U.S. 130, 153 (1967) .................................................................. 20

Farber v Jefferys, 103 AD3d 514, 515 (1st Dept 2013) ................................................................ 22

Gertz v. Robert Welch, Inc., 418 U.S. 323, 333–34 (1974) .................................................... 20, 22

Goldblatt v. Seaman, 225 A.D.2d 585, 586 (2d Dep't 1996) ........................................................ 22

Gottwald v Sebert, 40 NY3d 240, 251-252 (2023) ....................................................................... 21

Gunduz v. New York Post Co., 188 A.D.2d 294, 294 (1st Dep't 1992) ....................................... 16

Hayt v Newsday, LLC, 176 A.D.3d 787, 788 (2d Dep't 2019) .................................................... 17

Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co., 49 N.Y.2d 63, 66–68 (1979) ......................................................................................................................................... 17

Hug v. City of New York, 927 F.3d 81, 88 (2d Cir. 2019) .............................................................. 5

Idema v. Wagner, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), aff'd 29 F. App'x 676 (2d Cir. 2002) ................................................................................................................................... 16, 17

Jewell v NYP Holdings, Inc., 23 F Supp 2d 348, 370 (SDNY 1998) .......................................... 19

Kesner v Dow Jones & Co., 515 F Supp 3d 149, 166 (SDNY 2021) ...................................... 8, 15

Kinsey v The NY Times Co., 991 F3d 171, 174 (2d Cir 2021) ...................................................... 8

L-7 Designs, Inc. v Old Navy, LLC, 647 F3d 419, 422 (2d Cir 2011) ........................................ 10

Lore v NY Racing Assn. Inc., 12 Misc 3d 1159[A], 1159A, 2006 NY Slip Op 50968[U], *3 (Sup Ct, Nassau County 2006) ............................................................................................................ 10

Morass v White, 571 F Supp 3d 77, 91-92 (SDNY 2021)............................................................ 10

N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964) .......................................................... 20

Pelayo v. Celle, 270 A.D.2d 469, 469 (2d Dep't 2000).............................................................. 17

Prince v The Intercept, 2023 US Dist LEXIS 119974, at *14 (SDNY July 12, 2023, No. 21-CV-
    10075 [LAP]) ....................................................................................................................... 23

Rakofsky v Washington Post, 39 Misc 3d 1226[A], 1226A, 2013 NY Slip Op 50739(U) (Sup Ct,
    NY County 2013).......................................................................................................... 15, 19

St. Amant v. Thompson, 390 U.S. 727, 731 (1968) ............................................................. 21, 23

St. Louis v. NYP Holdings, Inc., 2017 WL 887255, at *2 (Sup Ct. N.Y. Cty. Fen. 6, 2017) ...... 16

Test Masters Educ. Servs. v. NYP Holdings, Inc., 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009) . 15,
    16, 17

Tulczynska v Queens Hosp. Ctr., 2019 US Dist LEXIS 23751, at *11-12 (SDNY Feb. 12, 2019)9

Von Gerichten v. Long Island Advance, 202 A.D.2d 495, 496 (2d Dep't 1994) ........................ 15

## PRELIMINARY STATEMENT

Defendant THÉRIEL THÉLUS ("Thélus") is a journalist currently employed by TripFoumi, a Haitian digital media company.  SENET D. ACHILL ("Achill" and, together with Thélus, "Defendants") is owner of TripFoumi.  Defendants are being sued by another Haitian journalist, GUERRIER HENRI ("Henri" or "Plaintiff"), for Thériel's reporting on a letter sent to Henri by the Haitian Ministry of Justice and Public Safety Prosecutor's Office at the Civil Court of Port-au-Prince relating to Henri's reporting.

Briefly, dismissal of the instant action is warranted as Defendants are protected from Plaintiff's claims of defamation by the fair reporting privilege, which is absolute and cannot be overcome by allegations of malice or bad faith as well as the wire service defense.  Dismissal is additionally required as Plaintiff is a public figure and the Complaint does not and cannot allege the statements were made with actual malice.

## STATEMENT OF FACTS AS ALLEGED IN THE COMPLAINT

Plaintiff is a public figure who hosts a weekly radio broadcast in Haiti. (*See* Cplt ¶2).  Plaintiff is not a resident of New York and has no connection to the State. (*See* Cplt ¶8).  Defendant Thélus is a news broadcaster and host of the show Ti Koze ak TT. (*See* Cplt ¶5; website located at www.tripfoumi.com).   Thélus also writes articles for the news site www.tripfoumi.com, a leading source of news for events in Haiti[1]. (*See* Cplt ¶6).

---

[1] The complaint references the website.  This court therefore may consider the language on the newspapers' website, as well as other materials referenced in the complaint and matters of which judicial notice may be taken. See, e.g. Hug v. City of New York, 927 F.3d 81, 88 (2d Cir. 2019).

Plaintiff's history of interviewing Haitian gang members on his radio show is well documented[2]. Examples include an interview with Vitelhomme Innocent a.k.a. Vitelhomme, who discussed shooting a person in a fight (**Szalkiewicz Aff. Ex. 1**), Wilson Joseph a.k.a. Lanmo Sanjou (**Szalkiewicz Aff. Ex. 2**), who described carrying weapons as a way of political protest, Jimmy Cherizier a.k.a. BBQ, who spoke about kidnapping and carrying weapons (**Szalkiewicz Aff. Ex. 3**), and in interview with another known gang member, Krisla (**Szalkiewicz Aff. Ex. 4**). Each of these men have a long resume of violence. Vitelhomme and Lanmo Sanjou are both on the FBI's Ten Most Wanted List (**Szalkiewicz Aff. Exs. 5,6**) and in 2022 the United Nations Security Council released a statement calling Jimmy Cherizier "one of Haiti's most influential gang leaders" (**Szalkiewicz Aff. Ex. 7**).

After several of these interviews, on August 7, 2022, Radio Télé Métronome published a statement on Twitter that read "Guerrier Henry makes amends for his practice of giving interviews to thugs. The journalist, who finally recognizes that thugs are in search of legitimacy, says he regrets having participated in their promotion" (**Szalkiewicz Aff. Ex. 8**).

On January 30, 2023 the Ministère de la Justice et de la Sécurité Publique (the "Public Prosecutor's Office") indicated that the "Government Commissioner, acting in his capacity as guarantor of social order" was summoning Plaintiff to the prosecutor's office based on Plaintiff's "considerable deviations in one of [his] recent broadcasts, which could jeopardize public peace" and which "violate the basic rules governing the exercise of the noble profession of journalist." (*See* Cplt. Exhibit A). The letter further included a list of rules which Henri was being accused of violating, including those in the Haitian Constitution and Haitian Penal Code (*See* Cplt. Exhibit A). The laws listed in the letter included those which make journalistic speech subject to

---

[2] Copies of transcripts of previous radio interviews are annexed to Szalkiewicz's affirmation and the court can take judicial notice as they are integral to the Complaint (See Point I, infra).

censorship during wartime and place them under the code of criminal law.  Other laws listed

provide that conspiracies to excite citizens to arm themselves against the government would be

punishable as well as those for defamation and insults, a criminal offense under the Haitian Penal

Code.

 The article – and updated article – at issue are brief and pertain to Haiti's issue with

armed gangs and, more specifically, the relationships gang members have with influential

Haitians.  Citing to information provided by Radio Télé Emanciapation, the initial article

provided that Plaintiff "was accused of having links with armed bandits" and indicated that in

"one of his declarations…had asked for forgiveness for giving the floor to known criminals

during his show."  (Cplt. ¶18).  The article further indicated that Plaintiff's file was "rumored to

be transferred to the Judicial Investigation Office" and that "charges are receiving stolen goods,

complicity, and privileged relationships with armed gangs, according to the previously cited

station" (Cplt. ¶18).  The updated article provided additional information about the commissioner

who had summoned Plaintiff, the names of the gang leaders who Plaintiff had hosted, and

citations to the source of the information, including "according to a tweet from radio

Emancipation FM[,]" "According to Emancipation FM radio[,]" and "as reported by

Emancipation FM, a radio station broadcasting in Port-au-Prince" (Cplt. ¶52).  Notably, Plaintiff

is not denying that he "asked the public to forgive him for having given his microphone to the

various gang leaders who terrorize the population, notably Krisla, head of Tibwa, and

Vitelhomme Innocent, the powerful "Kraze Barye" gang leader actively wanted by the US

judicial authorities for the kidnapping of several American citizens" (Cplt. ¶52) instead stating

the "only major difference" between the article and updated article related to the removal of

several words and addition of an exclamation point in the headline (Cplt. ¶53).

Notably absent from Plaintiff's Complaint is the letter Henri received from the Prosecutor's Office dated January 12, 2024 and which asked him to "respond to charges of promotion of criminality, incitement to violence and conspiracy against national security" (**Szalkiewicz Aff. Ex. 9**) as well as the Tweets and articles made by other news organizations (*See* **Szalkiewicz Aff. Exs. 10**) which are referenced in the allegedly defamatory article(s). Importantly, the January 12, 2024 letter, like the January 30, 2023 letter, was made public by the Ministry of Justice or Prosecutor's Office and shared with news outlets via WhatsApp.

## <u>ARGUMENT</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "A complaint is properly dismissed where, as a matter of law, 'the allegations in a complaint, however true, could not raise a claim of entitlement to relief.'" <u>Kesner v Dow Jones & Co.</u>, 515 F Supp 3d 149, 166 (SDNY 2021).  For motion to dismiss purposes, the complaint is deemed "to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." <u>Kinsey v The NY Times Co.</u>, 991 F3d 171, 174 (2d Cir 2021). This Court has previously held that there "is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." <u>Kesner</u>, 515 F Supp 3d, at 166-167.

As detailed below, Plaintiff's Complaint should be dismissed because the allegedly statements are accurate restatements of reports from other news sources, because they are protected by privilege, and because malice is not properly asserted.

I.      **The Tweets, Radio Broadcasts, and Stories upon which Defendants' Statements were Based should be Considered by the Court.**

While extrinsic evidence is not normally permitted on a 12(b)(6) motion, courts may consider "documents that the plaintiff either possessed or knew about and relied upon in bringing the suit.  Artful pleading by the plaintiff is exemplified by the failure to include matters of which as pleaders they had notice and which were integral to their claim — and that they apparently most wanted to avoid; this will not forestall a district court's decision on a motion to dismiss." Tulczynska v Queens Hosp. Ctr., 2019 US Dist LEXIS 23751, at *11-12 (SDNY Feb. 12, 2019) (internal citations and quotations omitted).

Plaintiff has deceptively excluded relevant information from the Complaint to bolster his claims that the statements are false.  The complained of statements emphasize that they are being made based on reporting undertaken by Radio Télé Emancipation.  Despite this, Plaintiff fails to include the underlying reporting in his Complaint.  Because the statements and thus the Complaint, by including those statements, explicitly reference that reporting, the underlying articles and Tweets are incorporated by reference and, even if they were not, are integral to the Complaint, and should be considered on a motion to dismiss.  The New York Southern District Court has previously held that:

> the court may permissibly consider extrinsic materials where such are incorporated by reference or where a document is one "upon which [the complaint] solely relies and which is integral to the complaint." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis and modification in original); see also Cummings v. City of New York, No. 19 Civ. 7723 (CM) (OTW), 2020 U.S. Dist. LEXIS 31572, 2020 WL 882335, at *3 n.2 (S.D.N.Y. Feb. 24, 2020) ("In reviewing a motion to dismiss, a court may consider, inter alia, (1) documents that are incorporated by reference into the complaint, and (2) documents that, even if not incorporated by reference, the defendant has notice of and that are 'integral' to the complaint without converting the motion to dismiss to a motion for summary judgment." (quoting BankUnited, N.A. v. Merrit Env't

> Consulting Corp., 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018))). For a document to be incorporated by reference, the complaint must make a "clear, definite and substantial reference to the document[]." Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003). For the document to be "integral," the complaint must "rel[y] heavily upon its terms and effects, and the plaintiff has actual notice of all the information in the documents and relied upon those documents in framing the complaint."
> Morass v White, 571 F Supp 3d 77, 91-92 (SDNY 2021)

For instance, in Lore, the defendant was allowed to introduce, in a motion to dismiss, the collective bargaining agreement which preempted the plaintiff from bringing the claim; defendant's introduction of the agreement resulted in dismissal of the case against defendant. See Lore v NY Racing Assn. Inc., 12 Misc 3d 1159[A], 1159A, 2006 NY Slip Op 50968[U], *3 (Sup Ct, Nassau County 2006).

This is because a plaintiff's "failure to include matters of which as pleaders they had notice and which were integral to their claim - and that they apparently most wanted to avoid - may not serve as a means of forestalling the district court's decision on a 12(b)(6) motion." L-7 Designs, Inc. v Old Navy, LLC, 647 F3d 419, 422 (2d Cir 2011).

Here, the underlying news story and Tweets are referenced throughout the allegedly defamatory statements and should be deemed incorporated by reference because the Complaint makes six "clear, definite and substantial reference[s]" to the reporting.  However, even if the Court disagrees with this conclusion, they should still be considered on a motion to dismiss because they, along with the second letter received by Plaintiff, are integral to the decision and Plaintiff had actual notice of the information therein and relied upon the documents in framing the Complaint.

**A. Consideration of the Underlying Reporting is Appropriate as it is Incorporated by Reference and/or Because it is Integral to the Complaint and Plaintiff had Actual Notice**

The allegedly defamatory statements and thus the Complaint reference the underlying

reporting on six occasions (emphasis added below):

- …Guerrier Henri was summoned by the Court of Port-au-Prince **according to the Radio Télé Emancipation**… (Cplt. ¶18).
- …The charges are receiving stolen goods, complicity and privileged relationships with armed gangs, **according to the previously cited station**. (Cplt. ¶18).
- Journalist Guerrier Henri has been invited to the Port-au-Prince public prosecutor's office on Wednesday, February 1, 2023, to answer questions from Police Commissioner Lafontant, **according to Radio TeleEmancipation**… (Cplt. ¶52).
- The news professional is accused of having privileged relations with armed bandits, **according to a tweet from radio Emancipation FM**…(Cplt. ¶52).
- …**According to Emancipation FM radio**, his case is about to be transferred to the examining magistrate's office…(Cplt. ¶52).
- The charges are: receiving stolen goods, complicity and privileged relations with armed gangs, **as reported by Emancipation FM**, a radio station broadcasting in Port-au-Prince…(Cplt. ¶52).

The reporting referenced in the Complaint is integral to this Court's decision and, given

the clear, repeated references to the underlying reporting within the allegedly defamatory

statements, Plaintiff clearly had actual notice of Defendant Thériél's source.

The underlying reporting, annexed to this motion as **Szalkiewicz Aff. Ex 16**, provides as

follows:

**Article 1:**

>**The journalist Guerrier Henri will be pursued in court by senator Jean Marie Salomon**
>As kidnappings are rampant these days in Haiti, the host of the radio show "Boukante Lapawòl" Guerrier Henri, during one of his broadcasts, did not hesitate to reveal the school's name attended by one of Senator Jean-Marie Salomon's children, the plate number, and car color in which the child is taken to school every day.
>Enraged by this irresponsible behavior endangering his child's life, especially when you consider the Senator's fight against the executive branch's attempt to shorten his term, Jean Marie Junior Salomon threatens to take legal action against Guerrier Henri, a journalist, host of the radio show Boukante Lapawòl which airs from 8:00 to 10:00 pm on Radio Mega.

During this interview on Radio Carraibes, on the program Ranmase, the senator declared that the current administration recruited many journalists considered "seniors", to help confront all those against its policies.

As a reminder, this journalist is the subject of several investigations. Less then two months ago, according to statements by the Senate's President, Carl Murat Cantave, Guerrier Henri threatened to attack him if he refuses to negotiate. An accusation which was promptly denied by Guerrier Henri. It must be noted that this journalist had already exchanged words with Senator Jean Renel Senatus during an interview where many statements were made. (https://www.tripfoumi.com/blog/2020/01/19/le-journaliste-guerrier-henri-sera-poursuivi-en-justice-par-le-senateur-jean-marie-salomon/, January 19, 2020) (**Szalkiewicz Aff. Ex. 11**)

**Tweet 1:**

Guerrier Henry makes amends for his practice of giving interviews for thugs.  The journalist, who finally recognizes that thugs are in search of legitimacy, says he regrets having participated in their promotion.  The Boukante Lapawòl presenter pledges not to carry on this practice. #metronomehaiti (https://twitter.com/Radio_Metronome/status/1556395037658857473, August 7, 2022, Radio Télé Métronome, (97.5 FM) @Radio_Metronome) (**Szalkiewicz Aff. Ex. 8**)

**Tweet 2:**

Guerrier Henri is invited to the Public Prosecutor's Office in Port-au-Price. According to a reliable source, his file has been transferred to the Court's Investigating office for concealment, complicity, favored business relations with armed gangs/#childsupport Listen to 👉https://youtu.be/N4ZdPWF6v8g (https://twitter.com/telemancipation/status/1620510183842775042?s=46&t=9iM4JjF7xphm1WYMlac9iQ, January 31, 2023, Émancipation FM (90.7), @TelEmancipation) (**Szalkiewicz Aff. Ex. 12**)

**Tweet 3:**

Haiti/Crime : Guerrier Henri is expected at the Prosecutor's office in Port-au-Prince, this Tuesday, January 16th, 2024, at 10 :00 am.  He is being prosecuted for promoting crimes, inciting violence, and plotting against national security, according to the Public Prosecutor's Office. (https://twitter.com/telemancipation/status/1747027371889205391 , January 15, 2024, Émancipation FM (90.7), @TelEmancipation) (**Szalkiewicz Aff. Ex. 13**)


All of the documents are relevant and should be considered on the motion to dismiss.

**B.  Consideration of the Second Letter is Appropriate as it is Integral to the Complaint**

The second letter received by Plaintiff from the Ministry of Justice and Public Safety is also integral to the Complaint.  Addressed to "Mr. Guerrier HENRI" and dated January 2, 2024, the letter provides:

> The Government Representative at the Court of the First Instance of Port-au-Prince request that you appear at the Prosecutor's Office of this jurisdiction on Tuesday, **January 16, 2024,** at 10:00 am, in order to respond to charges of promotion of criminality, incitement to violence and conspiracy against national security made by you during the Boukante Lapawòl broadcast on Radio Mega.

Defendants, as members of the press, received an image of this letter in a message sent by the Ministry of Justice and Public Safety Prosecutor's Office at the Civil Court of Port-au-Prince (**Szalkiewicz Aff. Ex. 9**).  The letter was included in a January 15, 2024 article published by Defendants and, despite being withheld by Plaintiff for the purposes of his Complaint, its consideration is integral to this Court's determination, especially Plaintiff's claim in paragraph 16 of his Complaint that "he…was not asked to appear on a later date, and has heard nothing further about the matter from the Public Prosecutor to the present time" (**Szalkiewicz Aff. Ex. 14**).  Additionally, Plaintiff had actual notice of the second letter because it was sent to him by the Prosecutor's Office and likely sent to him separately as well due to his role as a member of the press.

**C.  Radio Interviews between Plaintiff and Criminals**

Finally, Plaintiff engaged in several radio interviews with Haitian criminals in the months leading up to him receiving the letter from the Prosecutor's Office's (**Szalkiewicz Aff. Exs.**

**1,2,3, and 4**).  These interviews were with criminals such as Vitelom, Lanmo, Krisla, and BBQ, were part of the reason he was summoned to the office.

Vitelhomme Innocent, for instance, is on the Federal Bureau of Investigation's ten most wanted fugitives list.  His poster indicates his role as "leader of the gang Kraze Barye" and details his involvement with kidnapping 17 missionaries and holding them for ransom, kidnapping one American, and killing another American[3].  Lanmo Sanjou, leader of the other gang involved in kidnapping the missionaries, 400 Mawozo, is also wanted by the Federal Bureau of Investigation[4] for his involvement.  Jimmy Cherizier a.k.a. BBQ was placed on the United Nations Security Council sanctions list because he "engaged in acts that threaten the peace, security, and stability of Haiti and has planned, directed, or committed acts that constitute serious human rights abuses[5]."  The U.N. specifically cited BBQ's role in numerous attacks with civilian casualties, including one attack on a Haitian neighborhood in which 71 people were killed, at least seven women raped by armed gangs, and more than 400 houses were destroyed. In 2022, BBQ blocked free movement of fuel from the Varreux fuel terminal – the largest in Haiti" with the U.N. writing that "his actions have directly contributed to the economic paralysis and humanitarian crisis in Haiti.[6]"

With the additional information, it is clear the statements were not defamatory and Plaintiff has failed to state a cause of action for which relief can be sought.

## II.      The Statements are Protected by the Fair Report and Fair Index Privilege.

Plaintiff's claims that the article and headline defame him are baseless for two reasons. *First*, the headline is a fair index of the contents of the Article and, therefore, non-actionable.

---

[3] https://www.fbi.gov/wanted/topten/vitelhomme-innocent  (**Szalkiewicz Aff. Ex. 5**)
[4] https://www.fbi.gov/wanted/additional/lanmo-sanjou  (**Szalkiewicz Aff. Ex. 6**)
[5] https://www.un.org/securitycouncil/content/jimmy-cherizier (**Szalkiewicz Aff. Ex. 7**)

*Second*, the headline and Article is privileged as a fair and true report of legislative and official proceedings under New York Civil Rights Law § 74 ("Section 74").

### A.  The Headline Is a Fair Index of the Article's Truthful Contents

It is clear by now that Plaintiff did not voluntarily appear at the prosecutor's office, nor was the request done to applaud his work as a public radio broadcaster.  At the time he received the letter, Plaintiff was facing charges of "promotion of criminality, incitement to violence and conspiracy against national security."  This lawsuit is about the Plaintiff trying to silence the press from detailing his run ins with the law, an action the First Amendment frowns upon.  "New York recognizes an absolute immunity for 'any person, firm or corporation[] for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." Kesner, 515 F Supp 3d, at 167.  Additionally, Plaintiff complains of that the article's headline is defamatory because he was not "charged with a crime."  Setting aside the fact that the headline never uses the word "charged" the law is clear that a headline is not actionable so long as it is a "fair index of the substantially accurate material included in the article." Test Masters Educ. Servs. v. NYP Holdings, Inc., 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009) (internal quotations omitted); see also Von Gerichten v. Long Island Advance, 202 A.D.2d 495, 496 (2d Dep't 1994) (holding that "headline of the article . . . must be read and evaluated in conjunction with the text it precedes").

"The apparent purpose of the privilege is to promote the dual public policy interest of ensuring the free flow of true information without fear of being sued, and public dissemination of judicial decisions and proceedings for proper administration of justice" and the "privilege has been liberally interpreted to provide broad protection for news reports of judicial proceedings"

Rakofsky v Washington Post, 39 Misc 3d at 1226A, 2013 NY Slip Op 50739(U) (Sup Ct, NY County 2013).

Notably, "courts have established the meaning of a 'fair and true' report as a substantially accurate report" and "have rejected the notion that a news report be tested for literal accuracy." Id.. In deciding whether an article is a "fair report" courts require only "substantial as opposed to literal accuracy" due to the nature and subjectivity of news reporting. Id.

Under this standard, "[a] newspaper need not choose the most delicate words available in constructing its headline." Test Masters, 603 F. Supp. 2d at 589. Rather, "it is permitted some drama in grabbing its reader's attention." Id. (using "Scam" in headline to refer to company was fair index of article that explained the Consumer Protection Bureau had investigated the company and demanded that it provide refunds); see also Gunduz v. New York Post Co., 188 A.D.2d 294, 294 (1st Dep't 1992) (headline, "Public Enemy No. 1" was non-actionable fair index of article even though plaintiff, a taxi cab driver, had not committed a crime). That is, even if a headline is "unfortunate, sensationalist and drafted simply to garner attention," it is not actionable where it is a "fair index of the underlying article." St. Louis v. NYP Holdings, Inc., 2017 WL 887255, at *2 (Sup Ct. N.Y. Cty. Fen. 6, 2017).

Here, the headline "Guerrier Henri summoned by the court of Port-au-Prince for complicity and contact with armed gangs" is "substantially accurate." The article explained that Plaintiff was summoned to Court of Port-au-Prince because of his relationship with gangs. The fact that Exhibit A of the Complaint did not use the word "armed" does not take away from the fact that the letter Plaintiff received related to his relationship with criminals.

**B. The Headline and Article Are a Privileged Fair Report of Governmental Proceedings**

The article itself is a fair reporting on an official proceeding and therefore barred by New York Civil Rights Law Section 74, which provides, in relevant part, that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding."  The New York legislature enacted the rule to avoid stifling "an active, thriving and untrammeled press" and to ensure that the press receive "broad protection." Idema v. Wagner, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), aff'd 29 F. App'x 676 (2d Cir. 2002) (internal quotes omitted).  The privilege created by Section 74 is "absolute" and a question of law.  See Pelayo v. Celle, 270 A.D.2d 469, 469 (2d Dep't 2000).  For this reason, courts regularly dismiss libel actions based on this privilege prior to engaging in discovery. Idema, 120 F. Supp. 2d at 365–66; Cholowsky v. Civiletti, 887 N.Y.S.2d 592, 595–96 (2d Dep't 2009); Hayt v Newsday, LLC, 176 A.D.3d 787, 788 (2d Dep't 2019).

As with the fair index privilege, there is no requirement of precision in reporting on the proceeding but instead that the "substance of the article be substantially accurate." Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co., 49 N.Y.2d 63, 66–68 (1979). The New York Court of Appeals has explained:

> [Media] accounts of legislative or other official proceedings must be accorded some degree of liberality. When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision... Nor should a fair report which is not misleading, composed and phrased in good faith under the exigencies of a publication deadline, be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used.
> Id. at 68.

Here, the Article focuses on an "official proceeding"- Plaintiff being summoned to the Prosecutor's office because he chose to endanger the citizens of Haiti. "New York courts have broadly construed the meaning of an official proceeding as used in Section 74." Test Masters, 603 F. Supp 2d at 588. "The test is whether the report concerns actions taken by a person officially empowered to do so." Id.  The January 31, 2023 letter on which Defendants reported provided that Plaintiff had been observed by a guarantor of social order "considerabl[y] deviati[ng]" in one of his "recent broadcasts, which risk endangering public safety."  The letter stated that such "deviations violate…articles 28-2, 2nd paragraph, 28-3 of the Constitution and provisions of articles 64, 67, 313 and following of the Haitian penal code" (**Szalkiewicz Aff. Ex. 15**).  The court can take judicial notice that Article 64 of the Haitian Penal Code provides that "…conspiracies whose purpose will be to destroy political institutions or change the government, to excite citizens or inhabitants to arm themselves against the authority of the Head of State will be punished for detention" and provides for a minimum ten year penalty.  Article 313 "onwards" of the Haitian Penal Code was also listed as a rule from which Plaintiff deviated and relates to defamation as well as insults and the revelation of secrets.  The section indicates that one who imputes facts that undermine another's "honor and consideration" may be imprisoned from anywhere between one month to three years.  As stated in the letter, these are crimes under the Haitian Penal Code and the letter indicated that Plaintiff's broadcasts had violated them.

Defendants relied on the January 31, 2023 letter, in tandem with other news outlet reporting, to state describe the charges listed in the letter as "receiving stolen goods, complicity and privileged relationships with armed gangs[.]"  The article provides that Plaintiff had been "summoned" and "was accused" but never stated that he had been charged.  Contrary to Plaintiff's assertion, Defendants never wrote that "plaintiff was charged with a crime of

'complicity and relations with armed gangs" only that he was summoned for it.  Accordingly,

Defendants' article(s) constitute a fair report of the underlying proceeding.


### III.     Defendants are Protected by the Republication Exception or Wire Service Defense

Defendants, respected news reporters, are protected by the "wire service defense" from

any liability.

The allegedly defamatory statements relied – and indicated they so relied – on reporting

from another news organization.  The New York Southern District Court has held that a

"company or concern which simply republishes a work is entitled to place its reliance upon the

research of the original publisher, absent a showing that the republisher 'had or should have had,

substantial reasons to question the accuracy of the articles or the bona fides of (the) reporter.'"

Jewell v NYP Holdings, Inc., 23 F Supp 2d 348, 370 (SDNY 1998).

> It is well settled that a republisher may rely on the research of the original
> publisher, "absent a showing that the republisher had, or should have had,
> substantial reasons to question the accuracy of the articles or the *bona
> fides* of [the] reporter.'" (*Karaduman v Newsday, Inc*., 51 N.Y.2d 531,
> 550, 416 N.E.2d 557, 435 N.Y.S.2d 556 [1980], quoting *Rinaldi v Holt,
> Rinehart & Winston*, 42 NY2d 369, 383, 366 N.E.2d 1299, 397 N.Y.S.2d
> 943 [1977].) This exception applies where one news agency republishes
> the content of a news story that was originally published by another
> reputable news agency or source.

> Rakofsky, supra.

In Rakofsky, the court held that "republished direct quotes or summarized…content of articles

that were originally published" by a different organization were immune from defamation claims

because the defendants "were entitled to rely on the research and reporting of…a reputable news

agency, which was clearly a substantially accurate report as stated above, in their republication"

(Id.).  As this Court held in Jewell, it is not necessary that the republished material have come

from a wire service and "New York recognizes a general republication defense applicable to anyone who republishes material from any source, provided there was no substantial reason to question the accuracy of the material or the reputation of the reporter" Jewell, 23 F Supp 2d at 371.

In addition to the January 30, 2023 letter, Thélus also relied on Tweets 1-3 when writing the article. Thélus referenced his reliance on the other reporting within the article. Tweet 1 indicated that Plaintiff had made "amends for his practice of giving interviews for thugs[,]" "regrets having participated in their promotion" and "pledges not to carry on this practice." Tweet 2 indicated that "[a]ccording to a reliable source, his file has been transferred to the Court's Investigating office for concealment, complicity, favored business relations with armed gangs[.]" Additionally, as TripFoumi published in 2020 (Article 1), Plaintiff had previously revealed, on air, where a government official's child attended school as well as a detailed description of the car which the child takes to school. Thélus had no substantial reason to question the accuracy of any of this material and, with the allegations supported by the letter, the underlying reporting, and his general understanding of Plaintiff's character, he moved forward with publishing the article. One should question why Plaintiff, if he believed these other publications are false, did not include them as co-defendants in this case. Accordingly, because the TripFoumi articles properly relied on research undertaken by other news sources, the articles are immune from a defamation claim.

## IV.    The Articles Are Nonactionable because Plaintiff is a Public Figure and the Complaint Fails to Adequately Allege Malice.

The First Amendment has prohibited a public celebrities from recovering damages for a defamatory falsehood unless "he proves that the statement was made with 'actual malice'—that

is, with knowledge that it was false or with reckless disregard of whether it was false or not."

N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964). The Supreme Court later expanded

this rule to include public figures, in addition to public officials, Curtis Publ'g Co. v. Butts, 388

U.S. 130, 153 (1967); Gertz v. Robert Welch, Inc., 418 U.S. 323, 333–34 (1974), and the law is

now clear that a public figure libel plaintiff bears the burden of proof on actual malice, a burden

he must carry by "demonstrat[ing] with clear and convincing evidence that the defendant

realized that his statement was false or that he subjectively entertained serious doubts as to the

truth of his statement." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30

(1984); see also St. Amant v. Thompson, 390 U.S. 727, 731 (1968) ("There must be sufficient

evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the

truth of his publication."); Biro v. Condé Nast, 807 F.3d 541, 544, aff'd 622 F. App'x 67 (2d Cir.

2015).

Plaintiff's complaint uses "actual malice buzz-words" (Id.) to factiously allege that

Thélus did not like Plaintiff based on a grudge he held; however, Plaintiff fails to allege the

proper malice standard.

### A. Plaintiff is a Public Figure.

As a public figure or public personality, Plaintiff was required to meet certain pleading

requirements, to be discussed in the section below.  "A public figure is someone with 'general

fame or notoriety in the community, and pervasive involvement in the affairs of society'".

Coleman v Grand, 523 F Supp 3d 244, 255 (EDNY 2021).

> There are two types of public figures: general and limited purpose public
> figures. General purpose public figures are those who "occupy positions of
> such persuasive power and influence that they are deemed public figures
> for all purposes," and must therefore meet the actual malice standard for

all libel claims…To qualify, the person's fame must be 'very great; the individual must be a 'household name' on a national scale
<u>Id</u>.

Conversely, limited purpose public figures

'may invite publicity only with respect to a narrow area of interest' and may fairly be considered public figures only where the alleged defamation relates to the publicity they sought…One becomes such a limited-purpose public figure through some 'purposeful activity,' by which the individual has 'thrust' themself ' into the public spotlight and sought a continuing public interest in [their] activities"... In that case, an otherwise private individual may properly be considered 'a public personality'
<u>Gottwald v Sebert</u>, 40 NY3d 240, 251-252 (2023)

Plaintiff's Complaint indicates that he has been a radio broadcaster since 2000 and has worked at five different radio stations in Haiti during his decades-long career (¶1). Plaintiff further claimed that he was a "News Director at Radio Zenith FM" from 2013 until 2015 (Cplt., ¶3).  Accordingly, Plaintiff is a general purpose public figure or, at the very least, a limited purpose public figure with respect to his role as a reporter with thousands of listeners.

In 2013, one New York court held that a journalist who published countless articles had "voluntarily injected herself into the controversial debate on whether HIV causes AIDS" had "'projected her name and personality before readers of nationally distributed magazines to establish her reputation as a leading authority' in this area" <u>Farber v Jefferys</u>, 103 AD3d 514, 515 (1st Dept 2013).  While the journalist in <u>Farber</u> may have published many articles about HIV, Plaintiff here has a two-hour broadcast five times per week and has been a radio broadcaster for 24 years.  Based on his own admission, Plaintiff is a public figure and was required to allege malice.

**B.  Plaintiff has not Plausibly Alleged Malice.**

Plaintiff can only recover for defamation upon "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." <u>Gertz</u>, 418 U.S. at 342. This standard, referred to as "actual malice," is measured by "what the defendant actually believed and not by 'what a reasonably prudent man would have published or would have investigated before publishing.'" <u>Goldblatt v. Seaman</u>, 225 A.D.2d 585, 586 (2d Dep't 1996) (quoting <u>St. Amant</u>, 390 U.S. at 731).  On a motion to dismiss, "a public-figure plaintiff must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." <u>Biro</u>, 807 F.3d at 546 (citation omitted). Additionally, "the defendant must have made the false publication with a high degree of awareness of... probable falsity, or must have entertained serious doubts as to the truth of his publication." <u>Prince v The Intercept</u>, 2023 US Dist LEXIS 119974, at *14 (SDNY July 12, 2023, No. 21-CV-10075 [LAP]).

The Supreme Court has provided examples of the facts that can support a claim for actual malice, such as where a story is fabricated by the defendant or is based wholly on "unverified" or "anonymous" sources; where the "allegations are so inherently improbable that only a reckless man would have put them in circulation;" and "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." <u>St. Amant</u>, 390 U.S. at 732.

Plaintiff does not deny he received the letter; Plaintiff does not even bother denying he engaged in conversations with gang members.  Plaintiff's only tender of proof that Thélus acted with actual malice is he had resentment due to allegedly being fired **eight years** prior to the article being written and that **six months after** the article was written, Thélus posted the letter on his Facebook page.  Neither of these occurrences are sufficient to raise to the level of actual

malice **at the time** the Article was written.  A plain reading of the letters, the tweets, and other articles written at the time Thélus made the statements easily rebut Plaintiff's assertion of actual malice.  There can be no doubt Thélus believed the Prosecutor's Office summoned Plaintiff because he did something wrong.

Even more tangential is Plaintiff's one sentence concerning Defendant Achill- that he apparently knew that the statements were false because he refused to remove the article from the website.  This circular logic does not rise to actual malice and would cut the other way; Defendant Achill, running a reputable news outlet, would keep the article online because he believed the statements to be true, not false.

In a last-ditch effort to save his case, Plaintiff asserts that on August 30, 2023 "the Public Prosecutor issued a statement which said that "from July 2022 to date, no complaint has been filed against Mr. Guerrier HENRI."  Plaintiff though concedes that he did receive the letter.  Unfortunately for Plaintiff, Defendants are not soothsayers with the ability to predict the future; they only had the ability to report on the information available to them at the time, not what may have happened eight months later.

### V.    The Statements are True

What can be clear is that Plaintiff is not an innocent actor in this case.  Plaintiff spends a great deal of time in his complaint reciting what the Article says but very little effort talking about what is allegedly false.  At best, it appears that Plaintiff needed to rewrite the article in his complaint to make it appear more defamatory, first substituting the word "summoned" with "charged" (Compl. ¶19) and then claiming that there was no reference to criminality when in his own complaint Plaintiff concedes that the letter accused him of violating "articles 64, 67, 313 et

seq. of the Haitian penal code" (Compl. ¶19).  The court can take judicial notice that a penal code relates to the commission of a crime.

Ultimately, while the Plaintiff may not like that the world learned of his potential criminal conduct, there is nothing that was substantially untrue about the article written about him.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request this court grant their Motion to Dismiss in its entirety.

Dated: April 12, 2024
        New York, New York

                                                    DANIEL SZALKIEWICZ, & ASSOCIATES, P.C.


                                                    By: _____/Daniel S. Szalkiewicz_____
                                                    Daniel S. Szalkiewicz
                                                    Cali P. Madia
                                                    *Attorneys for Defendants*